IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| A.P., by and through her Parent, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:21-cv-504 (LMB/TCB) |
| | ) | |
| THE SCHOOL BOARD OF FAIRFAX | ) | |
| COUNTY, | ) | |
| | ) | |
| Defendant. | ) | |

<u>MEMORANDUM OPINION</u>

Before the Court are cross-motions for summary judgment in an action brought under the

Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, <u>et seq.</u> Plaintiff, a

minor child identified as "A.P." by and through her mother "L.P." alleges that the School Board

of Fairfax County, on behalf of the Fairfax County Public Schools ("FCPS" or "defendant")

failed since 2018 to provide A.P. with the free appropriate public education ("FAPE") required

by the IDEA, and that, as a result, plaintiff should be reimbursed for various expenses including

the costs of A.P.'s placement at a private day school, the Lab School of Washington ("the Lab

School"). Defendant responds that it fully complied with the IDEA by proposing appropriate

individualized education programs ("IEPs") for A.P. for the school years at issue, which would

place A.P. in the least restrictive environment at her neighborhood school, Hollin Meadows

Elementary School ("Hollin Meadows"), and that L.P. previously consented to the 2018-19 IEP.

Defendant further argues that the Lab School is not only overly restrictive and not educationally

required, but has actually been educationally harmful to A.P.

Plaintiff has exhausted the IDEA's required administrative procedures by presenting her

claims to an independent hearing officer. After a five-day administrative hearing in which 14

witnesses testified and 152 exhibits were introduced, the hearing officer found for defendant.

Plaintiff timely appealed the decision to this Court. Oral argument on the cross-motions for

summary judgment was cancelled after the Court determined that oral argument would not assist

the decisional process. Accordingly, the motions have been decided on the papers submitted. For

the reasons explained below, defendant's Motion for Judgment on the Administrative Record

[Dkt. No. 25] will be granted, plaintiff's Motion for Judgment on the Administrative Record

[Dkt. No. 29] will be denied, and judgment will be entered in defendant's favor.

## I.   BACKGROUND

### A.   **Factual Background**

In 2015, A.P.'s kindergarten teacher at St. Aiden's half-day program first alerted L.P. that

A.P. may have potential language delays and should be evaluated. A.P. "couldn't come up with

words" to match a picture, she "couldn't rhyme," and her teacher was concerned that she might

have "some sort of language delay." Tr. 79:3-16.[1] A.P. was also unable to meet benchmarks on

the PALS screener.[2] Id. at 79:21. The kindergarten teacher advised L.P. that A.P. could be

evaluated by a Speech and Language therapist through the public school system. Tr. 80:9-13. On

January 28, 2015, the Local Screening Committee met and determined that there was sufficient

evidence to refer A.P. for an evaluation. AR 1. Accordingly, in March 2015, A.P. was evaluated

by Lesley Morgan, a Speech and Language Pathologist. AR 2. From this evaluation, A.P. was

designated as eligible for special education, with a speech and language impairment, AR 3, and

---

[1] References to the testimony before the hearing officer are indicated as "Tr."; references to the documents and exhibits considered during the administrative proceeding are indicated as "AR."

[2] Virginia's Phonological Awareness Literacy Screening (PALS) is mandatory for evaluating students from kindergarten through the second grade in Virginia.

in June 2015 her first IEP was implemented. AR 4. It set a single communication goal for A.P. to be able to exhibit an understanding of sequential and conditional language. AR 4-002.

A.P. repeated kindergarten at Hollin Meadows, where she "met her benchmark[s]" and "had a great year," according to her mother. Tr. 85:9-12. AR 5, 6. L.P. was so pleased with A.P.'s instruction that she requested a "first grade teacher similar to [A.P.'s kindergarten teacher]" for the next school year. AR. 9. A.P.'s June 2016 annual IEP continued to contain a single communication goal, this one directed to retelling stories or events. AR 8-002.

In first grade, A.P. struggled almost right away. AR 13, 15, 16. She failed to meet benchmarks, especially in reading, and her teachers told her mother that they had to prompt A.P. all the time. Id.; Tr. 88:3-89:5. L.P. testified that when she asked what her next steps were, A.P.'s teachers said they did not know, but suggested that A.P. be seen by a doctor. Tr. 89:3-5. In November 2016, A.P. was evaluated over a two-day period at Children's National Hospital ("Children's"). AR 10A. The testing revealed that A.P. had several challenges, including a language-based learning disability (dyslexia) and a potential learning disability in math. Id. She was also diagnosed with attention deficit disorder and executive function disorder.[3] Id. A.P.'s teachers were surprised that she had dyslexia. Tr. 93:18.

To add this new information to A.P.'s IEP, the IEP reevaluation committee reconvened on February 2017; however, instead of relying on the evaluation from Children's, FCPS determined it needed to test A.P. to determine if her eligibility status should change. AR 14. Accordingly, on March 2, 2017, AP was evaluated by a social worker, AR 17; on March 7, 2017

---

[3] That evaluation also found that A.P. "demonstrate[d] some possible signs of anxiety" and recommended that A.P. receive therapy to target her anxiety. AR 10A-008. This anxiety developed more as time went on, and L.P. raised the issue during A.P's special education reevaluation in May 2020. AP 69.

she was tested for her non-verbal abilities, which were found to be average, AR 18; on April 25, 2017, she was evaluated by a school psychologist and found to have an IQ of 82 (normal), but with various deficits in verbal abilities and memory, AR 19; and in late April 2017, she was evaluated for her educational achievement using the Kaufman Test of Educational Achievement ("KTEA"), which mostly presented low average achievement. AR 20.

Meanwhile, L.P. advocated for A.P.'s services to begin before this review process was completed. AR 118-005, -006, -007. In response, A.P.'s reading teacher, Ms. Drembus, obtained training on Wilson Fundations, a reading intervention program created by Wilson Language Training Corporation, and started using that program in April 2017. AR 12-004,-005; AR 81. Ms. Drembus then "crunched" the first unit of the program into just one week to make more progress by the end of the school year. AR 12-005. At the time, L.P. thought that was a good approach. Id. An IEP meeting was held in June 2017 to plan for A.P.'s next school year, in which she would be in second grade. AR 25. At that meeting, eight goals were drafted, mostly focusing on communication, reading, and writing concerns. Id. L.P. consented to this IEP. AR 25-022.

Around that time, L.P. requested that A.P. be connected with Learning Ally, an audiobook provided for students with reading disabilities; however the technology request "fell through the cracks" until the fall, and was later misconstrued as a request for assistive technology for writing, which was rejected. Tr. 120:5-123:20. AR 33-34. Apparently, neither L.P. nor A.P.'s teacher knew that Learning Ally was available to A.P. without any additional IEP meetings or approvals, and she could have been using it all summer. A.P.'s mother found this failure to provide A.P. with Learning Ally very frustrating. Tr. 123:12-20.

Over the summer of 2017, A.P. attended an extended school year summer program through FCPS. After the program ended, L.P. learned that instead of continuing A.P.'s phonological awareness work through Wilson Fundations, the summer program taught balanced literacy with leveled texts and three-cueing (using pictures and context to follow a story). Tr. 152:5-154:13. Plaintiff's expert witness testified that this reading instruction is inappropriate for students with A.P.'s profile. Tr. 491:1-20; 516:10-20; 538:11-539:2.

A.P. started second grade at Hollin Meadows; however, because L.P. had become increasingly worried about how A.P.'s dyslexia was being addressed at Hollin Meadows, she hired a private tutor for A.P. to work on reading through a more intensive program, the Wilson Reading System, three days a week. Tr. 125:14-126:4. A.P. continued to work through the Wilson Fundations program at school, four days a week. Id. L.P. testified at the hearing that she "started becoming a little concerned about whether or not the school team had enough knowledge and resources to provide [A.P.] everything that she needed." Tr. 126:9-12. At home, A.P. still struggled to sound out words and comprehend sentences. Tr. 127:1-6.

By the middle of A.P.'s second grade year, L.P. had a significant "concern that the very kind people at Hollin Meadows—very loving teachers—did not have the requisite training to… help a child that has pretty severe dyslexia and a constellation of other learning disorders," and she began to look at other schools. Tr. 144:14-18. Accordingly, on January 12, 2018, she submitted an application to the Lab School for the 2018-19 school year. AR 36. On the same day, A.P. completed a private psychological evaluation. See AR 94. Because her verbal comprehension scores were so inconsistent, the evaluator did not consider the scores valid, AR 94-005; however, the evaluator determined that A.P. had certain nonverbal strengths, including fluid reasoning. AR 94-004.

Also in January and February of 2018, L.P. conducted some research and found that Wilson Fundations, the program defendant was using for A.P., was not preferred for students who like A.P. suffer from severe dyslexia and require more intensive intervention. Tr. 130:10-17. Instead, a different Wilson Language Training program, the Wilson Reading System, was recommended for such students. See AR 84 (Wilson Teacher Manual explaining how Fundations can be implemented with a "double dose" for Students with a Language-Based Learning Disability but suggesting that "[t]he Wilson Reading System, taught by a certified Wilson instructor, may be more appropriate for students in grades 2 and 3 who require more intensive instruction"); AR 112 (FCPS reading programs analysis describing Wilson Fundations as targeting Tier 2 students, not Tier 3 students such as A.P.[4]); AR 81-001 (describing Fundations as appropriate for "Prevention- Tier 1" and "Early Intervention- Tier 2"). Accordingly, L.P. contacted Kelly Brady, the dyslexia coordinator for a number of schools in FCPS, including Hollin Meadows. Tr. 130:19-21. Brady told L.P. that FCPS did not offer the Wilson Reading System but could double up Fundations. Tr. 131:11-17. Another IEP meeting was convened in February 2018 in response to L.P.'s concerns. AR 38. As a result, A.P.'s time on Fundations was increased to 60 minutes a day; however, to schedule this increase, 30 minutes were taught by her trained special education teacher, Ms. Haynes, and 30 minutes were taught by a paraprofessional. AR 38-011; Tr. 136:12-137:3. Both had attended the Wilson Fundations training program, and

---

[4] Fairfax County Public Schools groups students into three tiers, described as follows: "Tier 1 - All students receive: Evidence-based, high quality core instruction, Differentiated instruction and additional support as needed. Tier 2 - Some students receive: Small group targeted intervention in addition to high quality core instruction. Tier 3 - Few students receive: Intensive intervention in area(s) of need in addition to high quality core instruction." Multi-tiered Systems of Support, Fairfax County Public Schools, https://www.fcps.edu/academics/academic-overview/special-education-instruction/multi-tiered-systems-support (last visited April 5, 2022). A.P.'s mother testified at the administrative hearing that A.P. required Tier 3 intervention. Tr. 131:5-6.

Ms. Haynes testified that she planned and supervised any review and reinforcement lessons taught by the paraprofessional and introduced all new material herself. Tr. 676:20-677:3; id. at 924:6-13. L.P. testified that A.P. became very frustrated by the confusion caused by having two different teachers for the same program and began to exhibit new problem behaviors at home, including bedwetting and emotional outbursts. Tr. 136:12-138:17; 142:6-143:12.

The Lab School accepted A.P. and on March 16, 2018, L.P. signed the Enrollment Contract, AR 40, which indicated her acknowledgement she would be contractually obligated to pay the entire next year's tuition unless she submitted a written notice of cancellation before May 31, 2018, which would be two days before A.P.'s official annual IEP meeting. Tr. 268:1-270:7. L.P. testified that she had obtained some kind of insurance in case A.P. did not enroll. Id.

The Hollin Meadows team continued to believe their program was helping A.P. make progress. They primarily measured that progress through the Diagnostic Reading Assessment ("DRA"), which involves the student reading a passage aloud and demonstrating comprehension of the passage. See, e.g., AR 121 (DRA Teacher Observation Guide). Multiple experts, including defense experts, raised concerns about the use of the DRA as a primary measure of reading for dyslexic students, as it does not assess phonological awareness and only tests whole word knowledge and comprehension. See, e.g., Tr. 1423:11-17 ("The DRA measures a broader base of reading comprehension with elements of accuracy and fluency. But for it to be … the most accurate for a student with dyslexia, we do recommend that the word analysis be given in conjunction."). In addition, given the variability in A.P.'s DRA scores, AR 7, at least one expert testified that the only conclusion to draw was inconsistency. Tr. 1062:1-20. In addition to the DRA Scores, A.P.'s work on Fundations resulted in various Unit Tests that showed her progress through the program, at least as to spelling/encoding. AR 30.

**Third Grade: 2018-19 School Year**

On May 29, 2018, the IEP team met to draft A.P.'s official IEP for the following school
year. The IEP contained goals in communication, mathematics, writing, reading, and phonics.
AR 43. The Hollin Meadows team declared that A.P. had made great progress and was reading
almost at the second-grade level according to her DRA scores, and they suggested continuing the
current set of supports. AR 43-014. L.P. expressed concerns at this meeting, particularly about
the use of Fundations, AR 43-015, but did not tell the team at that time that she had signed a
contract with the Lab School or that she planned to seek reimbursement for private placement,
although she testified that several members of the IEP team were aware of her applications to
other schools. Tr. 275:18-19. Despite her concerns, L.P., who admitted that she was an attorney,
gave written consent to the IEP. Tr. 277:10-11; 7:5-9.

That summer, A.P. attended a summer program with a researcher at Georgetown
University's Center for the Study of Learning ("Georgetown Center"). Tr. 155:1-4. At the end of
the summer, the lead researcher, Dr. Eden, told L.P. that "[A.P.'s] challenges were very severe—
and that it was critical that [A.P.] get proper remediation." Tr. 156:15-157:7. She also explained
that "time was of the essence" or A.P. might be "potentially forever behind," because of how
schools use reading and texts to convey learning in other content areas as students get older. Id.;
Tr. 157:10-17. Accordingly, on August 10, 2018, L.P. emailed the school to "request an IEP
meeting as soon as we can to discuss" Dr. Eden's findings regarding A.P. from the summer
program. AR 114-008; Tr: 158:2-9. Because it was summer, a meeting was difficult to schedule.
On August 20, via email, L.P. first gave the notice required by the IDEA that she planned to
withdraw A.P. from Hollin Meadows and seek reimbursement for the Lab School tuition. AR 97;
AR 48. On August 27, 2018, an addendum IEP meeting was held at which FCPS considered

A.P.'s request for reimbursement but rejected that request after determining that A.P.'s "needs can be met with base school services." AR 49-013,-014. L.P. did not sign the I.E.P. and A.P. began the 2018-19 school year at the Lab School. AR 49-026. L.P. did not pursue her request for tuition reimbursement.

During A.P.'s first year at the Lab School, she received a new Speech and Language Assessment which found that A.P. continued to exhibit a "Mixed Receptive/Expressive Language Disorder." AR 99. The Lab School also conducted more detailed phonemic awareness assessments that showed A.P.'s reading skills to be far lower than suggested by her DRA scores at Hollin Meadows. AR 100, 102. According to the Lab School, between the fall of 2018 and the winter of 2019, A.P. moved from reading at the Primer level (kindergarten) to Level L, which is a mid-second grade level. Compare AR 114 with AR 126.

**Fourth Grade: 2019-20 School Year**

Defendant conducted an IEP meeting in the spring of 2019 to determine an appropriate placement and supports for A.P.'s fourth grade year. The IEP referenced evidence from the Lab School, and was finalized on June 11, 2019. AR 53. In response to L.P.'s concerns about A.P.'s language disorder, the IEP recommended that the hours of speech and language therapy for A.P. be increased from 2 hours a month to 3 hours a month, and the hours of special education services be increased to 20 hours per week within the general classroom and 5 hours per week in a resource room. AR 53-020,-030. The IEP stated that "[t]he team will consult with office of Special Education Instruction (Dyslexia Office) to identify the appropriate program to be implemented given [A.P.'s] student profile." AR 53-020. L.P. did not sign this IEP. AR 53-033.

On September 25, 2019, the FCPS IEP team reconvened again to consider private placement for A.P. AR 55. The team members determined that "updated assessments and an

observation at the Lab School" would help them determine an appropriate placement. AR 55-020, AR 56. A psychological evaluation conducted as part of that evaluation indicated that A.P. had an IQ of 74 and no auditory processing or phonological processing deficits because her "performance is commensurate with her overall ability." AR 57-009. The parties hotly contested whether this was a valid assessment, because it seemed out of line with previous and later assessments. Other assessments by FCPS at that time continued to indicate language difficulties. AR 59. The KTEA was again administered. It showed A.P. performing mostly in the 2nd and 3rd percentiles. AR 63. The IEP team also administered another DRA, which placed A.P. at a level 16, reflecting an end of first grade reading level. AR 64-020.

Although defendant's testing showed stagnation or regression, the Lab School's data showed A.P. improved during the 2019-2020 school year in her phonological awareness and in her reading level, moving from a reading Level E to a Level J by the winter of 2020. AR 125. On December 20, 2019, the IEP team reconvened. AR 64. The team determined that, based on the various assessments conducted by FCPS, A.P. had "not made marked improvements" since leaving FCPS. L.P. disagreed. AR 64-020. Again, FCPS determined that Hollin Meadows provided the least restrictive environment for A.P. and placement at the Lab School was not appropriate. AR 66. Again, L.P. did not appeal that decision.

### Fifth Grade: 2020-21 School Year

On February 4, 2020, L.P. signed an enrollment contract with the Lab School for the 2020-2021 school year. AR 67. She also sought to have A.P. privately evaluated. An educational evaluation conducted on February 3, 2020 found that while A.P. had borderline verbal functioning, her other reasoning scores (nonverbal and spatial) were average or high, making it difficult to draw an overall level of intellectual functioning. AR 108.

10

A.P.'s three-year IEP reevaluation took place on May 8, 2020. AR 69. Updated progress reports from the Lab School were not available, but the IEP team interpreted a Lab School assessment for the fall and winter of 2019 as showing "limited progress or regression" with certain literacy skills. AR 69-002. The team also considered L.P.'s concern about A.P.'s anxiety related to returning to Hollin Meadows. Other test scores were analyzed and discussed and A.P. was again found eligible for services, based on a Specific Learning Disability, Other Health Impairment (ADD), and Speech/Language Impairment. Id.; AR 70, 71.

On May 13, 2020 the team met to draft A.P.'s IEP for the 2020-21 school year. AR 73. The IEP proposed increasing A.P.'s speech and language services to 4 hours a month and increasing her special education services to 12.5 hours a week in the resource room and 7.5 hours in the general education inclusion setting. Id. Additionally, to take into account L.P.'s concerns about A.P.'s anxiety, 30 minutes of counseling per month were added to her services. AR 73-034. L.P. again objected to the IEP, because she "did not believe that [A.P.] made progress while in FCPS" and because she believed that "[A.P.] requires a private school placement." AR 73-021.

On September 11, 2020, A.P. received a private auditory processing assessment, which found that A.P. had auditory processing disorders in the areas of overloading and processing speed, lexical extraction, attention, and auditory phonemic analysis. AR 110-006. On October 20, 2020, the IEP team reconvened. AR 75. During the meeting, FCPS staff explained that it is FCPS policy to accommodate auditory processing but not to create specific goals to remediate or treat it. L.P. opposed this approach. Tr. 1224:20-1225:19. She also expressed concerns about the lack of training and knowledge about dyslexia held by the IEP team members, who referred her

to the district's special education office for answers about programming and training. AR 75-017.

The IEP reflected that the IEP team and L.P. discussed what the least restrictive environment would be for A.P. and considered L.P.'s concerns that A.P.'s reading instruction would "take[] into account her complex needs and allow[] her to access the curriculum/programming proposed with fidelity." AR 75-017. It also showed that defendant found that due to A.P.'s "extensive needs in the area of reading" she required "targeted instruction in a homogenous small group (no more than 3 students) for 45 minutes a day." Id. L.P. questioned how A.P.'s "anxiety would be managed within the small group setting" due to her "difficulties with attention and processing." Id. She also argued that A.P. required "1 on 1 instruction in the area of reading." Id. To address A.P.'s social and emotional needs the school team proposed "an increase in counseling related services," with a clinician who would work with A.P. to identify times of anxiety within the academic setting and develop strategies to support her accessing the instructional setting. Id. Coping skills would be taught within a small group to support A.P.'s generalization of those skills to the large group setting. Id. As for reading support, the IEP proposed:

> The targeted reading group will be homogeneous (no more than 3 students) and fidelity driven (45 minutes per day). This will include a highly structured instructional approach and the presentation of the methodology taught will be done in a sequential, repetitious, and targeted manner. The teacher providing instruction will use Orton-Gillingham methodology and there would be ongoing progress monitoring checks to support with implementation fidelity. The FCPS dyslexia specialist will follow up with the teacher and will also provide implementation check-ins to ensure the fidelity of instruction. [L.P.] was also provided the contact information for the FCPS dyslexia specialist.

Id. The IEP concluded that A.P.'s least restrictive environment is "base school level services" and that placement at the Lab School was not required. AR 75-018. L.P. did not agree to the IEP. AR 75-034.

**B. Procedural Background**

On August 24, 2020, L.P., by counsel, filed her initial administrative complaint requesting a due process hearing to contest defendant's IEPs for the 2018-19 and 2019-20 school years. The complaint was amended on October 23, 2020 (after the October 20, 2020 IEP meeting detailed above) to include the 2020-21 school year.[5] On November 16, 17, 18, 19, and 30, 2020, the administrative hearing took place. The parties filed post-hearing briefs on January 7, 2021, and the hearing officer issued a decision on January 22, 2021, finding that plaintiff failed to prove any predetermination on behalf of FCPS regarding the outcome of the 2018 IEP meeting; the Lab School was not the appropriate "least restrictive environment" for the student; L.P. consented to the 2018-19 IEP and therefore "cannot successfully challenge the IEP as inappropriate" for that school year; the proposed IEPs for the 2019-20 and 2020-21 school years offered A.P. a FAPE; and A.P.'s anxiety disorder did not justify her enrollment at the Lab School, which does not specialize in students with emotional disabilities. Given these conclusions, the hearing officer held that L.P. was not entitled to reimbursement for the expenses of the Lab School and any other expenses, except for the reasonable costs of Dr. Ling's evaluation.[6]

---

[5] FCPS made an offer of settlement in the amount of $19,010, which would reimburse A.P.'s mother for the costs of private evaluations, tutoring, and speech language services incurred over several years but did not cover the tuition at the Lab School. AR 77. Plaintiff rejected the offer.

[6] The school district did not object to, and did not appeal, the decision that it pay the costs of Dr. Ling's evaluation.

Plaintiff has appealed the hearing officer's decision to this Court, seeking reimbursement for tuition and other expenses incurred from the 2018–19 through 2020-21 school years at the Lab School. [Dkt. No. 1]. She also seeks reasonable attorneys' fees under the IDEA, and a determination that "private day school placement at the Lab School was the appropriate IEP placement" for A.P.[7] Id.

## II. DISCUSSION

### A. <u>Standard of Review</u>

Although IDEA cases are original civil actions, they are adjudicated based upon the record of the administrative proceedings. Cnty. Sch. Bd. of Henrico Cnty. v. Z.P., 399 F.3d 298, 309 n.7 (4th Cir. 2005). Accordingly, judicial review "may be conducted on the administrative record even if there are disputed issues of material fact." Indep. Sch. Dist. No. 283 v. S.D., 88 F.3d 556, 561 (8th Cir. 1996). The parties have agreed that their cross-motions for summary judgment should be based on the administrative record, which has been supplemented by additional documents developed since the administrative hearing. See [Dkt. No. 7] at 3.

As the party challenging the administrative decision, plaintiff bears the burden of establishing that the decision was erroneous. Barnett v. Fairfax Cnty. Sch. Bd., 927 F.2d 146, 152 (4th Cir.), cert. denied, 502 U.S. 859 (1991). To prevail, plaintiff must show both that the IEPs offered by FCPS were not appropriate for A.P. and that the Lab School, which L.P.

---

[7] The complaint also seeks the costs incurred for "Dr. Lucker's Auditory Processing Independent Educational Evaluation and Speech Language Independent Educational Evaluation and for Dr. Ling's Psychoeducational Independent Educational Evaluation." [Dkt. No. 1] at 35-36. Defendant pointed out in its answer that "reimbursement of the evaluations … were not contested in the hearing and are not at issue. Plaintiff need only submit documentation for them to receive reimbursement." [Dkt. No. 5] at 27. Despite that answer, plaintiff insists in her motion for summary judgment that she still wishes to be reimbursed for any fees and expenses incurred for Dr. Lucker's Evaluation [Dkt. No. 30] at 32. Because defendant has admitted that it is not contesting the cost of Dr. Lucker's Evaluation, this issue will not be addressed as it is moot.

unilaterally selected, was an appropriate placement. <u>Florence Cnty. Sch. Dist. Four v. Carter</u>, 510 U.S. 7, 15 (1993).

The United States Supreme Court has held that although a district court reviewing an administrative decision under the IDEA must "base its decision on the 'preponderance of the evidence,'" the IDEA also contains an "implied requirement that due weight shall be given" to administrative proceedings. <u>Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley</u>, 458 U.S. 176, 206 (1982). Accordingly, a district court reviewing a hearing officer's decision under the IDEA "conducts modified <u>de novo</u> review." <u>O.S. v. Fairfax Cnty. Sch. Bd.</u>, 804 F.3d 354, 360 (4th Cir. 2015) (internal quotations omitted). "[F]actual findings made during the state administrative proceeding are entitled to a presumption of correctness, so long as the findings were 'regularly made.'" <u>Z.P.</u>, 399 F.3d at 305 (citing <u>Doyle v. Arlington County Sch. Bd.</u>, 953 F.2d 100, 105 (4th Cir. 1992)). "Factual findings are not regularly made if they are reached through a process that is far from the accepted norm of a fact-finding process." <u>J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty., Va.</u>, 516 F.3d 254, 259 (4th Cir. 2008) (quoting <u>Z.P.</u>, 399 F.3d at 305). In addition, "credibility determinations implicit in a hearing officer's decision are [] entitled to deference" by a reviewing court. <u>Z.P.</u>, 399 F.3d at 307. Because regularly made findings and credibility determinations are entitled to "due weight" and are considered "prima facie correct," if a district court chooses to depart from the administrative officer's findings, the court must explain the basis for its departure. <u>Doyle</u>, 953 F.2d 100 at 105. <u>See also</u> <u>Board of Educ. v. Brett Y.</u>, 28 IDELR 460 (4th Cir. 1998) ("[T]he district court adhered to the appropriate standard of review by providing well reasoned explanations for rejecting the ALJ's findings.").

Plaintiff argues that the hearing officer's findings in this case were not regularly made because he misidentified the issues in the case, did not address procedural issues in his decision, quoted witnesses out of context, and had certain inconsistencies in his opinion. Pl. Br. [Dkt. No. 30] at 10-12. Plaintiff's arguments lack merit. Although the hearing officer's opinion was admittedly brief compared to a district court opinion, it referenced relevant caselaw and included citations to the record and quotations from witness testimony to support its conclusions. AR 183. Plaintiff contends that the hearing officer failed to address procedural issues entirely, but in fact he addressed her predetermination argument first. AR 183-003. To the extent he misunderstood L.P.'s argument regarding the type of reading program she requested for A.P., this dispute may better reflect plaintiff's lack of clarity in explaining what relief she sought. Accordingly, the Court finds that the hearing officer's conclusions were regularly made and are, therefore, entitled to appropriate deference.

## B. Analysis

### 1. Predetermination of the 2020-21 IEP

Plaintiff argues that there was a procedural error in the creation of the 2020-21 IEP. Specifically, she claims that defendant predetermined the 2020-21 IEP by conducting a "staffing" meeting before the IEP meeting with L.P. to develop a draft IEP and by declining to designate a specific reading intervention program during the IEP meeting, instead referring L.P. to the FCPS Office of Special Education Instruction (OSEI).

The IDEA's regulations require that parents be part of any decision-making group regarding their child's needs and placement, and a school district may not predetermine the outcome of an IEP meeting, which would inhibit the parent's role in that process. 34 C.F.R. 300.327; see also 20 U.S.C. 1414(e). Plaintiffs cite to Deal v. Hamilton Cnty. Bd. Of Educ., 392 F.3d 840 (6th Cir. 2004), in which there was significant evidence that the school district had a

16

policy of rejecting an intensive autism-therapy program because of its expense, and even when confronted with its effectiveness for the child at issue, refused to fairly consider it as a viable option. Plaintiff argues that A.P.'s case is similar to the Deal case because L.P. and the IEP team disagreed about the effectiveness of various programs for A.P.; Hollin Meadows staff were unable to identify any specific program they would use[8] or any staff who were trained in Orton-Gillingham Methodology,[9] the methodology L.P. wanted defendant to use; and instead of answering L.P.'s questions, staff referred her to the Office of Special Education Instruction. Plaintiff also argues that "the gatekeepers of all relevant information were not present" at the IEP meeting and the other educators at the IEP meeting could not justify their decisions, essentially preventing L.P. from having a dialogue with the decisionmakers.

To the extent plaintiff argues that the staffing meeting of the IEP team members before the hearing in 2020 was improper, the hearing officer correctly found that it is "standard procedure for school staff to meet prior to IEP meetings and prepare a draft IEP for discussion." AR 183-003. Moreover, the record shows that when L.P. complained that the proposed IEP was not sufficient, additional hours and programs were added, including honoring L.P.'s request for Orton-Gillingham methodology to be used and for mental health counseling to be added. The record shows that defendant fairly considered and often incorporated L.P.'s concerns and suggestions. Further, "an IEP is not intended to be an integrated contract. Rather, courts will look to the entire process..." Sauer v. Johnson, 36 IDELR 266 (E.D. Va. 2002). In Sauer, "Plaintiffs

---

[8] FCPS witnesses testified that it was not the district's practice to identify a specific brand of reading remediation program in an IEP, as different schools have different programs available, and the district prefers to maintain flexibility in case students need to change programs. Tr. 1025:14-1026:19.

[9] A program, which includes curricular elements like materials, scope, and sequence, is not the same as a methodology, which is an "approach" marked by certain pedagogical principles. See, e.g., Tr. 702:6-703:16.

argue[d] that the specific proposal was inappropriately vague about what exactly was being

offered to [the student]." Nonetheless, even though the IEP document in Sauer was unclear, the

court considered the entire process, including communications between school representatives

and the family, to determine that the offerings were made sufficiently clear. Similarly, in A.P.'s

case, the record shows that FCPS special education and dyslexia experts worked with L.P. and

the IEP team to suggest reading programs that would be appropriate for A.P., and to train Hollin

Meadows staff to administer those programs. Because L.P. was able to dialogue with the team

members, and her concerns were considered, even if not always resolved the way she wanted, the

Court concurs with the hearing officer that plaintiff has not carried her burden of establishing

predetermination.

### 2. Least Restrictive Environment

The IDEA requires that students be offered as much mainstream education as possible.

Accordingly, as long as FCPS offered A.P. a FAPE for the school years at issue, the Lab School

cannot qualify as the "least restrictive environment" mandated by the IDEA because it does not

provide A.P. access to her neurotypical peers. "Mainstreaming of handicapped children into

regular school programs where they might have opportunities to study and to socialize with

nonhandicapped children is not only a laudable goal but is also a requirement of the Act."

DeVries By DeBlaay v. Fairfax Cnty. Sch. Bd., 882 F.2d 876, 878 (4th Cir. 1989). In contrast

with the Lab School environment,[10] all of the draft IEPs in the record show that FCPS proposed

---

[10] The Lab School focuses on students with "language based learning differences," primarily
serving students with dyslexia "who may also present with other types of disabilities such as
auditory processing disorder…[or] attention deficit disorder." Tr. 1046:2-9. The students have a
range of dyslexia from mild to severe but "[p]robably more along the moderate to severe range."
Id. at 1046:10-14. The school does not serve students with intellectual disabilities or who
primarily have emotional disabilities. Id. at 1046:16-21.

that A.P. spend somewhere between 46% to 80% of her school day with her general education

peers (See, e.g., AR 75-030, 73-034, 64-034, 55-032, 53-030). Accordingly, the hearing officer

correctly concluded that if defendant offered A.P. a FAPE during the years at issue, the Lab

School would not qualify as the least restrictive environment for plaintiff.

### 3. Free Appropriate Public Education at Hollin Meadows

To determine whether a school has provided a student with a FAPE, a reviewing court

must determine whether the educational agency is:

> … providing personalized instruction with sufficient support services to permit
> the child to benefit educationally from that instruction. Such instruction and
> services must be provided at public expense, must meet the State's educational
> standards, must approximate the grade levels used in the State's regular education,
> and must comport with the child's IEP. In addition, the IEP, and therefore the
> personalized instruction, should be formulated in accordance with the
> requirements of the Act[.]

Rowley, 458 U.S. at 203–04. Given the absence of any procedural error, the primary question

before the Court is whether the IEPs for the three school years at issue were reasonably designed

to permit A.P. to benefit educationally. The "basic floor of opportunity" provided by the IDEA is

held to mean "access to specialized instruction and related services which are individually

designed to provide educational benefit to the handicapped child." Id. at 201. The IDEA does not

guarantee a specific pedagogical approach, or even a parent's preferred approach:

> In assuring that the requirements of the Act have been met, courts must be careful
> to avoid imposing their view of preferable educational methods upon the States.
> The primary responsibility for formulating the education to be accorded a
> handicapped child, and for choosing the educational method most suitable to the
> child's needs, was left by the Act to state and local educational agencies in
> cooperation with the parents or guardian of the child.

Id. at 207. Accordingly, even if the Lab School were the best or ideal placement for A.P., if

FCPS offered A.P. a free appropriate education during those school years, that is all that the

IDEA requires. An IEP must be "reasonable," but does not have to be "ideal." <u>Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1</u>, 137 S. Ct. 988, 999 (2017).

The record shows that the IEP goals drafted for A.P., except for the lack of an auditory processing goal in 2020-21, fairly reflect L.P.'s preferences. During her testimony, L.P. criticized the goals drafted in many of the IEPs; however, the hearing officer correctly found that plaintiff is not allowed to "Monday-morning quarterback" goals that she assisted in writing and to which she did not object at the time. The goals to which L.P. did not object are affirmed as appropriate. <u>Shaffer v. Weast</u>, 554 F.3d 470, 475-76 (4th Cir. 2009). Accordingly, the primary question for the Court to review is whether the support services and personalized instruction proposed for the school years at issue, all of which included A.P.'s placement at Hollin Meadows, were appropriate and beneficial. <u>Rowley</u>, 458 U.S. at 203.

a) <u>Estoppel for 2018-19 School Year</u>

Under the IDEA, a parent may obtain reimbursement for unilaterally enrolling her child in a private school "if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment," 20 U.S.C. § 1412(10)(C)(ii); however, the cost of reimbursement may be reduced or denied if "at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense." <u>Id.</u> at §1412(10)(C)(iii)(I)(aa). Defendant argues, and the hearing officer agreed, that L.P. is estopped from being reimbursed for the Lab School expenses incurred for the 2018-19 school year for two reasons. First she failed to advise the IEP team during the May 29, 2018 IEP

meeting that she planned to enroll A.P. in the Lab School for the 2018-19 school year, had signed an enrollment contract, and would be seeking reimbursement for the Lab School expenses from the defendant. Second, she consented to the IEP by signing it and as a lawyer she should understand the full consequences of providing that consent.

The hearing officer failed to acknowledge that the IDEA specifically provides that an IEP may be modified even after being signed. "In the event that it becomes appropriate to modify an IEP in the middle of the school year, the Act contemplates that the same procedures will be followed." Sanger v. Montgomery Cnty. Bd. of Educ., 916 F. Supp. 518, 520 (D. Md. 1996). See, e.g., 20 U.S.C. § 1414(d)(3)(D) and (F). Additionally, the IDEA follows a "knew or should have known" standard and contains no explicit rule of estoppel. 20 U.S.C. § 1415(b)(6)(B).

The record reflects that testing provided to A.P. at the Georgetown Center during the summer of 2018 constituted newly discovered evidence that revealed A.P.'s progress to be much worse than what Hollin Meadows had communicated. As a result, L.P. had a new objection to the 2018-19 IEP, and on August 10, 2018, she sought to reinitiate the IEP process for private placement, making a timely request for modification of the 2018-19 IEP. On August 20, 2018, before the school year began, she provided notice of intent to withdraw A.P. from Hollin Meadows. In response to her request for a new IEP meeting and notice of withdrawal, a new IEP meeting took place on August 27, 2018. Therefore, L.P. did comply with the IDEA notice requirement by alerting defendant before the IEP meeting of her intent to enroll A.P. in the Lab School and seek reimbursement for that placement.

Additionally, the record shows that L.P.'s communications with the FCPS team demonstrated an intent to bring A.P. back to Hollin Meadows when and if it was possible to do so. In Sanger, which the hearing officer cited, the parents "were wedded to funding at Grove and

nothing else. It thus would not have mattered in the least [what was proposed in the IEP] …

because from the outset the Sangers made it clear that they would not accept [the IEP]." Sanger,

916 F. Supp. at 526. In contrast, L.P. explicitly testified that she got tuition insurance because

she was not yet sure whether she would send A.P. to the Lab School for 2018-19. Tr. 268:1-

270:7.

Accordingly, because L.P. timely and properly requested a modification of the IEP once

she had reason to believe it did not provide a FAPE, and because she adequately provided notice

of her intent to enroll A.P. in the Lab School, she is not estopped from disputing whether the

2018-19 IEP offered a FAPE. The proper question before the Court is whether the 2018-19 IEP

offered a FAPE. Because the hearing officer found that L.P. was estopped from contesting the

IEP for the 2018-19 school year, he did not analyze this question; however, the Court finds the

record sufficient to resolve it without remand.

    b) FAPE for the 2018-19 School Year

Although the 2018-19 IEP is not as specific as later-created IEPs and relies excessively

on DRA scores and anecdotal evidence, it still represents a plan "individually designed" to

provide A.P. with "educational benefit." Rowley, 458 U.S. at 201. The FCPS and Hollin

Meadows staff present at the IEP meeting showed knowledge of A.P.'s strengths, weaknesses,

and areas of growth, and provided a plan designed with those strengths and challenges in mind.

See AR 49. Although the IEP does not list a specific reading program or methodology, as this

Court has found, "an IEP is not intended to be an integrated contract. Rather, courts will look to

the entire process…" Sauer v. Johnson, 36 IDELR 266 (E.D. Va. 2002). The record reflects that

the 2018-19 IEP was a product of FCPS staff working with L.P. to offer programs that would

provide A.P. educational benefit. In fact, L.P.'s objection to the IEP was not that it was of no

benefit or failed to provide support or personalized instruction but rather that it did not provide A.P. with the instruction or program that "best fits her needs." AR 49-013. The IDEA does not require a best fit or ideal program; it only requires an appropriate one. The 2018-19 IEP described Hollin Meadows's commitment to provide "ongoing trainings" for the teachers to be able to implement A.P.'s reading intervention with fidelity, described A.P.'s "solid progress" in reading and math in her current small group programs, and described the progress A.P. had made with her speech pathologist. AR 49-013. This educational progress showed that the 2018-19 IEP would provide A.P. the "basic floor of opportunity" required by the IDEA.

    c)   <u>FAPE for the 2019-20 and 2020-21 School Years</u>

By the 2019-2020 and 2020-21 school years, A.P.'s IEPs provided even more detail about how instruction would occur, what variety of assessments FCPS decisionmakers were relying on to evaluate A.P.'s skills, and even what specific programs would be offered. See AR 64-018; AR 75-017. These IEPs included a specific number of hours of services and responded to many of L.P.'s concerns by making adjustments as appropriate. For example, they require Hollin Meadows to provide A.P. with an evidence-based reading remediation program in a very small setting, counseling to treat her anxiety, and a combination of resource room and general education classes that would maximize her strengths and respond to her needs. These IEPs also provided A.P. with the least restrictive environment by giving her greater access to her neurotypical peers through mainstreaming. Although being in a one-on-one setting for reading instruction might yield greater educational benefit for a student like A.P. with a communication disability and ADHD, defendant's proposal of a 1-3 student small group was "reasonably calculated" to provide some "basic floor" of educational benefit. Rowley at 204. Further, there is evidence in the record that both Recipe for Reading and Corrective Reading, the programs

suggested by FCPS in the 2019-20 and 2020-21 IEPs, are evidence-supported for students with dyslexia. AR 78, 79, 80. Although L.P. preferred a goal regarding plaintiff's auditory processing, the hearing officer was not incorrect in deferring to defendant on its practice to accommodate such a disorder rather than actually treat it. Given this evidence, the hearing officer correctly found that defendant had complied with the IDEA by offering A.P. a FAPE for the 2019-20 and 2020-21 school years.

### 4. Anxiety Disorder

L.P. argues that A.P.'s "behavior" was not an issue in this case and that the hearing officer should not have considered A.P.'s anxiety as a factor; however, the record shows that L.P. cited A.P.'s anxiety about returning to public school to support her argument for placement at the Lab School. See, e.g., AR 75-018 ("Parent stated that she feels returning to Hollin Meadows will cause [A.P.] to have increased anxiety."). Therefore, the hearing officer was entitled to consider the evidence about A.P.'s anxiety disorder and correctly determined that it did not undermine the evidence that defendant offered A.P. a FAPE. In fact, in the 2020-21 IEP, defendant proposed counseling sessions for A.P. to address L.P.'s concerns about her daughter's anxiety. AR 73-034.

### 5. Reimbursement of Lab School Tuition and Expenses

Because defendant offered A.P. a FAPE during the years in question, L.P. is not entitled to reimbursement for the expenses incurred in A.P.'s enrollment at the Lab School. Nonetheless, in his analysis of A.P.'s FAPE for the 2020-21 school year, the hearing officer implied that the Lab School would not be a proper placement for plaintiff regardless of defendant's offering her a FAPE. AR 183-005. The Court concludes from a review of the record that on this point the hearing officer was incorrect.

24

To determine whether the Lab School was providing A.P. educational benefits, the hearing officer erroneously asked whether the Lab School was "closing the gap" between A.P. and her peers. This is an incorrect statement of the law. The correct question to ask is whether the Lab School enables A.P. to receive some educational benefit. Florence Cnty. Sch. Dist. Four, 510 U.S. at 11 (A unilateral private school placement is "'proper under the Act' if the education provided by the private school is 'reasonably calculated to enable the child to receive educational benefits.'" (internal citation omitted)).

A close analysis of record shows A.P.'s growth in reading and decoding while at the Lab School. AR 114-024 et seq.; AR 122 through AR 126. For example, when the Lab School tested A.P.'s knowledge of letter sounds and word patterns in the fall of 2018 she got 36/110 correct (of the first eleven patterns). Two years later, in the fall of 2020, she scored 84/110 correct for those same patterns. Further, she moved from reading at the Primer level (kindergarten) to Level L, which is a mid-second grade level. Compare AR 114-025 to AR 126-003. She also increased her knowledge of sight words (those which cannot be sounded out through phonics principles) from 20% in the winter of 2019 to 79% in the fall of 2020. AR 124-005, AR 126-002.

This record establishes that A.P. did receive "some educational benefit" from placement at the Lab School. Rowley, 458 U.S. at 200. Accordingly, the hearing officer's conclusion about the Lab School's educational benefit will be reversed; however, this finding does not entitle L.P. to reimbursement for her Lab School expenses, because the hearing officer correctly found that FCPS offered A.P. a FAPE for all the school years in question. Moreover, unlike the Lab School, Hollin Meadows, by being a neighborhood school and providing A.P. with the opportunity to be educated with non-disabled students, also would provide A.P. with a placement in the least restrictive environment, as discussed above. See 34 C.F.R. § 300.116(b)(3). Lastly, the hearing

officer properly concluded that plaintiff failed to produce any evidence documenting the "work product, progress, or any other aspect of the tutoring" to support her claim for reimbursement of A.P.'s tutoring expenses, and therefore correctly declined to award these expenses to plaintiff. AR 183-007.

### III. CONCLUSION

For all these reasons, the decision of the hearing officer is affirmed, except as to his conclusions that plaintiff was estopped from objecting to the 2018-19 IEP and that the Lab School did not provide A.P. with some educational benefit. Accordingly, defendant's Motion for Summary Judgment [Dkt. No. 25] will be granted, plaintiff's Motion for Summary Judgment [Dkt. No. 29] will be denied, and judgment will be entered in defendant's favor by an Order to be issued with this Memorandum Opinion.

Entered this _13_ day of April, 2022.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge